**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MALIBU MEDIA, LLC,**<br>                    **Plaintiff,**<br><br>                **v.**<br><br>**JOHN DOES 1, 6, 13, 14, and BRYAN**<br>**WHITE**<br>                    **Defendants.** | **CIVIL ACTION NO. 12-2078** |

Baylson, J.                                                                                          June 18, 2013

### <u>MEMORANDUM – REPORT ON  BELLWETHER TRIAL</u>

After determining a "Bellwether" Trial would be the best way to achieve a resolution of numerous copyright infringement complaints filed in this district by Plaintiff Malibu Media, LLC ("Malibu"), expedited pretrial proceedings resulted in a non-jury trial on June 10, 2013. Malibu, a producer of adult cinemas, alleged Defendants had downloaded its movies using a type of software known as "BitTorrent" without paying a licensing fee, and were therefore liable for damages for copyright infringement.

The proceedings resulted in admissions of liability by the three Defendants remaining in the case, and either settlements or determination of damages by the Court. The Court will also award attorneys' fees and costs against one of the three Defendants.

Because of significant interest in these cases, I have prepared this report of the proceedings, which may be of value to other judges in this and other districts who have numerous cases involving similar allegations. In doing so, I emphasize that Malibu is <u>not</u> what has been referred to in the media and legal publications, and in the internet blogosphere, as a "copyright troll" –i.e., a non-producer who merely has acquired the right to bring lawsuits

against alleged infringers.[1] Rather, Malibu is an actual producer of adult films and owns valid

copyrights, registered with the United States Copyright Office, in its works.[2]

      This report will be, purposely, factual and "plain vanilla" in its tone. My purpose is not to

criticize any party or counsel, but rather to report on the pleadings, discovery, and case

management aspects, and what management devices I employed to bring the matter to a

relatively speedy and fair conclusion.

## Initial Filings

      Three complaints originally filed by Malibu in April 2012, naming a total of 52

defendants denominated as "John Does," were assigned to my calendar.  Malibu promptly filed a

Motion for Leave to serve third party subpoenas on internet service providers ("ISPs"),[3] in order

to determine the actual names and addresses of the John Doe Defendants. (ECF 4).  In support of

its motion, Malibu asserted that it had valid internet protocol ("IP") address for each infringing

party.  Malibu documented an extensive and expensive investigation, as a result of which it was

---

[1] President Obama has personally condemned the practice of copyright trolls and patent trolls clogging the courts, see White House, Fact Sheet: White House Task Force on High-Tech Patent Issues (2013), available at http://www.whitehouse.gov/the-press-office/2013/06/04/fact-sheet-white-house-task-force-high-tech-patent-issues, and Chief Federal Circuit Judge Randall Rader, in a recent New York Times article, made similar comments, see Randall R. Rader et al., Make Patent Trolls Pay in Court, N.Y. Times, June 4, 2013, available at http://www.nytimes.com/2013/06/05/opinion/make-patent-trolls-pay-in-court.html.  Many internet blogs commenting on this and related cases ignore the rights of copyright owners to sue for infringement, and inappropriately belittle efforts of copyright owners to seek injunctions and damages.

[2] To be sure pornographic movies are not to everyone's taste, but media reports, as well as proceedings in another case before me, Free Speech Coalition et al. v. Holder, Civil Action No. 09-4607, have documented the frequency and prevalence of pornographic material on the internet, much of it for free and available to adults and minors of any age. My initial opinion dismissing the complaint in the Free Speech case is published at 729 F. Supp. 2d 691, 746 (E.D. Pa. 2010), affirmed in part and vacated in part, 677 F.3d 519 (3d Cir. 2012). Following remand, a non-jury trial was conducted in June 2012 and a decision will be forthcoming.

[3] Internet Service Providers ("ISPs") provide internet services to businesses, government and individuals. Two of the largest in the United States are Comcast and Verizon, but there are many others. Both Comcast and Verizon, and presumably other ISPs, employ significant digital databases by which they can supply the names and addresses of their subscribers according to an internet protocol address. They are frequently requested to provide this information to law enforcement and other government agencies, and have now become accustomed to subpoenas requiring they provide this information to parties in civil litigation, as well.

able to obtain internet addresses for the individuals who it asserted had illegally copied its movies. Malibu alleged this information was sufficient to support its selection of the John Doe Defendants.  A hearing was held on May 14, 2012. (ECF 7).  The Court's resolution, in an Order dated May 18, 2012, was to grant the motion to serve the subpoenas in part. (ECF 8).[4] Specifically, Plaintiffs were afforded the opportunity to serve the ISPs with Rule 45 subpoenas, commanding each ISP to provide Plaintiff with the true names and addresses of the Doe Defendants to whom the IP addresses were assigned. Plaintiffs also were directed to attach a Court-Directed Notice to the Rule 45 subpoenas and to instruct the ISPs to distribute copies of the Notice to each Doe Defendant, informing them that they shall have 21 days to file motions to quash or vacate the subpoenas. (Id.).

Several of the six John Doe Defendants identified as subscribers by the ISPs filed Motions to Dismiss the Complaint and/or to Quash the Subpoenas, asserting that there wasn't sufficient evidence to require the ISPs to reveal their identities. (ECF 9).  One motion was later withdrawn, leaving five pending before the Court.  Those five motions essentially sought three types of relief:

> 1.      Quashing the subpoenas to the ISPs on the grounds that Malibu did not have sufficient facts on which to have third party subpoenas issued.
>
> 2.      That the joinder of multiple John Doe Defendants in one Complaint was not proper and that the defendants who had been served should be severed from other defendants.
>
> 3.      That the allegations of the Complaint were not only untrue, but very embarrassing (because they dealt with downloading pornographic movies),

---

[4] Throughout this opinion, this Court will make references to various opinions and orders entered, and assumes that the reader has access to this Court's docket through PACER, the federal courts' publicly available digital access to court documents.  To repeat the contents of these significant orders in this case, even in summary form, would unnecessarily elongate this Report.  The court's Memoranda of October 3, 2012 (ECF 22), January 3, 2013 (ECF 55) and March 6, 2013 (ECF 118) contain many details about the factual and legal issues involved.

and therefore the John Doe Defendants should be allowed to proceed anonymously.

On August 16, 2012, Chief Judge Joyner, realizing that a large number of these cases had been filed in this District and were assigned to different judges, issued an Order directing that all of the Malibu cases filed in this District were referred to me "for monitoring and coordination of the following issues:  severance of defendants, the statute of limitations, discovery, scheduling of arbitration hearings, civil negotiations and trial dates." (ECF 12). However, Chief Judge Joyner also ordered that any cases subject to his August 16 Order remain on the calendar of the judge to whom it was assigned pending further order.  A number of my colleagues have consulted me from time to time, and I advised them that I had scheduled a Bellwether trial to take place after discovery and expert opinions.  I recommended that they stay their cases, pending the trial.

A hearing was held on September 18, 2012 to review the status of the case and determine what issues were important for pretrial discovery, so that the case could proceed to a resolution. In a Memorandum dated October 3, 2012, I reviewed the proceedings up to that point and determined that the best, if not the only, way to advance the litigation would be to designate the five individuals with outstanding Motions to Quash the Subpoenas or Dismiss the Complaint as Defendants as to whom a Bellwether trial would proceed.[5] (ECF 21 & 22). I concluded that Malibu had expended considerable effort and expense to determine the IP addresses of the infringing parties, and the technology employed by its consultants – both of whom were located in Germany and who testified at the trial of June 10, 2013 – was valid. (Memorandum, at 6-14) (ECF 21). I ordered that the ISPs comply with the Rule 45 subpoenas and tender the identifying information of the five Doe Defendants with outstanding motions before the Court to Plaintiff.

---

[5] Eventually, the Court determined that the three cases should be consolidated and all proceedings were then docketed in Civil Action 12-2078.

In turn, I ordered Plaintiff to effectuate service of the Complaints on those five Defendants within 10 days. (ECF 22). I stayed the litigation as to the remaining defendants in the three cases. (Id.).[6]

Service was eventually effectuated on the five Doe Defendants. (See, e.g., ECF 30 in Civil Action 12-2078) (relating that service of process was made on the individual named as John Doe 16 on October 20, 2012).

On November 2, 2012, Malibu filed an Amended Complaint. (ECF 34).

One of the owners of Malibu, Colette Field, filed an affidavit on December 5, 2012 asserting personal knowledge that Malibu was the copyright owner of the movies as to which the illegal downloading/copyright infringement had taken place.  (ECF 43). This affidavit, in combination with the affidavit that had been filed documenting the technology employed by Malibu to determine the internet addresses, supplied the Court with a solid factual basis upon which to conclude there was "plausibility" to Malibu's infringement claims and to deny the Motions to Dismiss that had been filed by the Doe Defendants. (ECF 55).  I also rejected Defendants' arguments that all members of a BitTorrent "swarm" were indispensable parties under Rule 19. (Id.).

After counsel met to discuss discovery, and filed a Rule 26(f) Report (ECF 37), a Rule 16 conference was held on November 28, 2012, which resulted in a detailed Scheduling Order

---

[5] As stated, there were initially 52 John Doe Defendants named across the three complaints. By the time of the Court's Order on October 3, 2012, Malibu had voluntarily dismissed 43 of the Doe Defendants because the timeline for service of process under Fed. R. Civ. P. 4(m) had expired. (See ECF 16, 17, and 23 in Civil Action No. 12-2088; ECF 15, 18 in Civil Action No. 12-2084; and ECF 13 in Civil Action No. 12-2078).  This yielded three remaining Doe Defendants – separate from the five who were designated as Defendants in the Bellwether trial – as to whom litigation was stayed. At the trial of June 10, 2013, Plaintiff's counsel stated the three remaining Does also been voluntarily dismissed. He explained that ISPs such as Comcast and Verizon do not keep the data necessary for correlating an internet protocol address with a name and address of a subscriber for lengthy periods of time – hence the need for voluntary dismissals. Apparently, Malibu decided as a matter of strategy that having the opportunity to gather evidence and prove its case as to the five individuals who were designated as Defendants for the Bellwether trial was sufficient for its purposes.

leading up to the Bellwether trial. (ECF 40).   On December 28, 2012, the Court issued an order compelling discovery against Defendants because they had not answered Malibu's discovery requests.   (ECF 54). After a number of depositions had taken place, the Court set deadlines for Rule 37 motions to prevent delay in resolving discovery disputes. There were a few conferences with counsel to resolve such discovery disputes.   Most of these were held by telephone and a record was made, through the Court's digital audio recording system.

When Defendants answered the Amended Complaint, they pled affirmative defenses and counterclaims that principally alleged abuse of process by Plaintiff in making untrue and unjustified allegations. (See, e.g., ECF 34, 58, 59).   On March 6, 2013, I issued an extensive Order and Memorandum denying Malibu's Motions to Strike the Affirmative Defenses and granting its Motions to Dismiss the Counterclaims, but without prejudice and with leave to amend. (ECF 103 and 117).   By this point, one of the five Defendants (John Doe 6) had been voluntarily dismissed (ECF 82), and by the time of trial, an additional Defendant (John Doe 14) was as well (ECF 113).   This left three John Doe Defendants for trial – John Doe 1, John Doe 13, and John Doe 16 – only one of whom, John Doe 16, filed an Amended Counterclaim. (ECF 109).


**<u>Joinder and Severance</u>**

As noted above, when the three cases assigned to me were filed, there were multiple defendants in each case.  Plaintiff, when faced with a motion to sever, asserted that the defendants were properly joined in a single complaint as members of a "swarm," a term of art relating to the functioning of the BitTorrent software.  According to testimony at trial, the BitTorrent software works automatically, joining together multiple internet subscribers (the "swarm") who are seeking to download the same movie at the same time.  These individuals do

not know each other.  The software sends different "bits" of the same movie to different users and when the overall download is completed, each internet subscriber who has logged on to the software will have the complete movie on his or her own computer hard drive.

I have previously cited decisions by other judges when faced with similar motions to sever in BitTorrent litigation. (<u>See</u> Memorandum, at 9-10, 14-17) (ECF 21). Some judges have allowed joinder of these multiple defendants in the same complaint because they reasoned the plaintiff's allegation that the defendants were part of the same "swarm" allowed for permissive joinder under Rule 20(a). Other judges have denied joinder, and in some instances, judges have even stricken complaints because they suspected the plaintiff's joinder of many defendants in the same complaint was done to avoid paying multiple filing fees. (<u>Id.</u> at 16). Another option is to stay proceedings against some defendants.

Malibu's Amended Complaint was limited to the five defendants still in the case.

I now believe that joinder of multiple defendants in a single complaint alleging copyright infringement through the use of BitTorrent technology is neither necessary nor appropriate.  This conclusion is reflected in my Order and Memorandum denying Defendants' Motions to Dismiss the Amended Complaint for failure to join indispensable parties under Rule 19. (ECF 55). As I held then and believe even more firmly now, members of BitTorrent "swarms" are not essential parties for copyright infringement suits involving BitTorrent technology because the "swarm" is formed automatically by the software, and not by any actual association of these defendants. Moreover, there are downsides to allowing permissive joinder. As trial judges are well aware, a large number of defendants in a single complaint poses significant management problems and often delays disposition of cases.  Further, joining multiple defendants allows the plaintiff to

avoid separate filing fees, and also pressures individual defendants to settle because their costs of defending a multi-party case are likely to be larger than if there is only one defendant.

For these reasons, and based on the record made in this case, I recommend against requiring joinder under Rule 19 and also against allowing it under Rule 20(a).

Malibu's counsel at the trial advised that although Malibu used to sue multiple defendants in a single complaint, it has since changed its practice. Its recent cases, counsel related, have been filed against a single defendant, alleging copyright infringement by that individual of a specific movie or movies.

**Pre-Trial Proceedings – Discovery Disputes, Admissibility of Evidence, and the Use of a Court-Appointed Expert**

Serious disputes concerning expert reports, the exchange of discovery materials, and the authenticity and admissibility of evidence, arose in April 2013.

First, there was a dispute concerning the preparation and service of expert reports. Plaintiff experienced a problem with meeting its deadline for serving its expert report, in part because its designated expert had died shortly before the deadline. A partner of Malibu's designated expert who had also been involved in the work took over, and after a short and understandable delay, Plaintiff did serve its expert report. None of the three John Doe Defendants who at that time were still facing a trial had designated an expert or served an expert report. Two of the three remaining Defendants intended to admit liability, and the trial as to them would be limited to damages.

Second, a dispute arose concerning the "readability" of the hard drive produced by Defendant John Doe 16 as part of discovery. Plaintiff's counsel belatedly learned from Plaintiff's

expert that he was not able to "read" the contents of the drive. Accordingly, Plaintiff filed an "emergency motion" on May 2, 2013, asserting fraud and seeking entry into Defendant's home in order to make "forensic copies" of his hard drives. (ECF 125). I held a number of telephone conferences on this issue, as I was principally concerned with either party intending to use exhibits at trial which had not been exchanged before trial. Although these exhibits were computer hard drives rather than documents, pretrial exchange was essential to prevent the trial from being bogged down with disputes about the authenticity and admissibility of the evidence. I issued a Memorandum and Order requiring an exchange of these hard drives on May 8, 2013 (specifically, ordering John Doe 16 to send Plaintiff a new copy of his hard drive and ordering Plaintiff to send John Doe 16 a copy of the drive it received). (ECF 133). Malibu withdrew the emergency motion[7], but as a result of the further exchange, asserted that John Doe 16 had manipulated his computer.

Accordingly, the third issue that arose before trial was whether Defendant John Doe 16 had intentionally fabricated evidence by manipulating his hard drive during discovery. Plaintiff filed a motion alleging such to be the case and attached a Declaration by its expert supporting the allegation. (ECF 140).

I decided to have a hearing pursuant to Federal Rule of Evidence 104 to provide an opportunity for live testimony by both Plaintiff's expert and John Doe 16 as to the readability, authenticity, and ultimately admissibility, of the various hard drives and computer-based data that had been exchanged between the parties during discovery. At the hearing, Plaintiff's expert

---

[7] Because the attorney for John Doe 16 had spent a large amount of time defending against the emergency motion, which was then withdrawn, I awarded attorneys' fees in favor of John Doe 16 and against Malibu for the time that had been taken by John Doe 16's attorney to defend this motion. (ECF 134). Although the issue was important, it was not an "emergency" and could have been more suitably dealt with by candid exchanges of information between counsel, and, if left unresolved, seeking a conference with the Court.

testified telephonically and through a streaming internet video shown in the Courtroom in Philadelphia.  He related his opinions as to both the "readability" and fabrication of evidence issues. First, Plaintiff's expert reiterated the conclusions expressed in a written report, that John Doe 16 had intentionally produced a non-readable hard drive as part of discovery. Second, he testified that after inspection of the second hard drive produced by John Doe 16, he concluded the Windows operating system had been installed on John Doe 16's desktop computer on November 11, 2012.  This was three days after Malibu had served John Doe 16 with a subpoena for his computer records, including copies of his hard drives.  Accordingly, Plaintiff's expert testified that in his opinion, John Doe 16 had "wiped clean" his desktop computer after receiving the subpoena, likely to conceal evidence of BitTorrent software or downloads.

John Doe 16 testified himself.  He admitted that he had a good deal of expertise about computers and owned three computers at his home, including a handmade desktop. He denied making any distortions or changes to the hard drives of any of the computers to make them non-readable, denied downloading BitTorrent software or any of Malibu's movies, and denied installing Windows to "wipe clean" his desktop computer on November 11, 2012.  In view of this denial, there was no longer any justification for him to proceed anonymously.  He identified himself as Bryan White.

John Doe 16 testified that the date of November 11, 2012, which appeared as the installation date for the operating system on his desktop, was not necessarily correct, because he had just been typing "1's and 0's" on the date that he started the operating system. He testified that the date of November 11, 2012 was not necessarily an accurate date.

As a result of these open disputes, the Court decided to appoint an independent expert under the Federal Rule of Evidence 706, and designated Louis Cinquanto as the expert.[8]  I met with Mr. Cinquanto and indicated to him the computer technology issues which needed an impartial investigation.

Since the jury trial would start June 10, 2013, the expert's testimony would help ensure trial time would not be consumed with the very technical disputes that could be possibly resolved prior to trial.  At the least, the Court-appointed expert could testify as a "neutral" witness on computer issues.

The Cinquanto report supported John Doe 16 on the "readability" issue, concluding that Plaintiff's expert, although claiming to have made a "forensically sound" copy of the initial hard drive produced by John Doe 16, had taken the hard drive out of its enclosure.  Mr. Cinquanto's report concluded that the expert should also have tested the hard drive while inside the enclosure, and if the expert had done so, he would have found the hard drive perfectly readable.  Prior to jury selection, Malibu's counsel acknowledged that Mr. Cinquanto was probably correct on this point.

On the second dispute, regarding whether John Doe 16 had "wiped clean" his personal desktop computer after having been served with a subpoena on November 8, 2012, Mr. Cinquanto concluded as follows:

> "I also examined the configuration of the defendant's original tower unit referred to as the John Doe Desktop. It was configured using 2 drives, a 240GB Solid Strate drive ("240GB SSD") and 1TB drive. There is nothing unusual about this configuration. The 240GB SSD appears to be the primary drive and contains among other things, a Windows 7 operating system.

---

[8] Mr. Cinquanto had previously done computer litigation support in a case before me and had testified as an expert on computer issues before other judges.  He owns a computer services firm in Philadelphia which provides technical advice to counsel and businesses and also provides courtroom support for presentation of digital evidence.

> The Windows operating system appears to have been installed on 11/11/12 on the 240 GB SSD; however, since the installation time of the operating system generates the installation date/time using the installer's input, the time is as accurate as the user types it. This determines the accuracy of the timestamp.
>
> Furthermore, I found no evidence to lead me to conclude with certainty that there was a prior functioning operating system on either the 240 GB SSD or the 1 TB desktop drives."

Largely, as a result of Mr. Cinquanto's report, which was conveyed to counsel several days before the trial was scheduled to start, John Doe 16, who to this point had denied any liability, authorized his counsel to admit that he had downloaded Plaintiff's copyrighted works, had "wiped clean" his desktop computer and installed a new operating system to conceal the downloading, and had testified falsely at the Rule 104 hearing.

When the Court convened on June 6, 2013 for jury selection, I was advised of this development, which meant that John Does 1, 13, and 16 were now all going to admit liability.  I was also advised that Plaintiff had reached private and confidential settlements with Does 1 and 13, which included their remaining anonymous. I decided to bifurcate the issue of damages as to John Does 1 and 13 –this would enable the Court to enter a judgment of liability as to all three defendants, to enter a judgment of damages only as to Bryan White (John Doe 16), and to preserve the anonymity of Does 1 and 13 at trial.[9]   Malibu requested the opportunity to introduce testimony as background for the determination of damages against Bryan White. Thus, the entire focus of the non-jury trial was to establish a record, following which I would make a determination as to the amount of damages to be found against White.

---

[9] I required these two Defendants to place their full names and addresses in a sealed envelope which would remain *in camera* unless good cause shown otherwise.

**Summary of Trial Testimony**

Malibu is owned by Colette Field and her husband Brigham Field.  Ms. Field testified credibly at trial.  Malibu's products are sold through its subscription based website which uses the domain name www.x-art.com.  For the first couple of years of its existence, Malibu had a production budget of between $150,000 and $200,000 a year.  It now spends over $2,000,000 a year to produce its movies.  Its subscriber base has grown from about 500 in year one to approximately 50,000 now.

Malibu spends substantial amounts of money to operate its business.  Malibu's expenses include compensation to actors, payments for servers and website maintenance, and purchases of bandwidth, among other things.  Malibu's subscription base has not increased over the last several years because people are downloading its movies from free via the BitTorrent Protocol.

In May 2013, Malibu estimated over 80,000 people illegally downloaded Malibu's movies in the United States through BitTorrent and over 300,000 people illegally downloaded Malibu's movies in the fifteen countries that IPP, Ltd., Malibu's investigator, tracks. This represented a typical month. Malibu subscribers routinely ask Malibu why they should pay a subscription fee when they can get its movies for free through BitTorrent. Since it has real costs, Malibu cannot compete with free copies of its movies.

Twice in 2013, unknown third parties hacked into Malibu's servers and put its movies onto BitTorrent prior to the time that these movies were released onto Malibu Media's website. These incidents cost Malibu thousands of dollars in lost subscription revenue.  Malibu now encrypts its movies prior to releasing them, and these enhanced security features cost Malibu approximately $15,000 a month. Nonetheless, they do not stop the infringement from occurring

13

once the movie has been unencrypted and then viewed.  All it does is stop the theft of its movies prior to release.

Malibu's subscribers have also complained that they can download its movies faster from BitTorrent than they can from its website. Consequently, Malibu started spending approximately $20,000 more a month this year to make its downloading speed faster than that which can be achieved through BitTorrent.

Many torrent websites, including The Pirate Bay, do not respect U.S. Copyright laws and intentionally situate themselves in countries outside the reach of copyright laws.  Ms. Field testified that she believes that this makes stopping the problem of BitTorrent piracy by suing the torrent websites prohibitively expensive and unlikely to succeed.  Moreover,  the  BitTorrent software developed by BitTorrent, Inc. can be used for legitimate non-infringing means.  Ms. Field testified that she believes suing BitTorrent, Inc. would be prohibitively expensive for Malibu Media.

The evidence that Malibu presented at trial was persuasive as to the fact that it had suffered real damages as a result of illegal downloading of its movies through BitTorrent.  At the close of trial, I summarized some of the precedents on damages in copyright cases, and stressed the importance of enforcement of copyright laws when the facts warranted a finding of infringement.

In this case, there was no question about the willfulness of the conduct of John Doe Defendants 1 and 13 and of Bryan White.  The only relevant factors that I found warranted some mitigation of damages was the fact that White did not make any profit from his infringement, that he had no prior record of infringement, and that he could not be solely responsible for the large amount of damages that Malibu had suffered as detailed above.

14

As many judges in copyright cases automatically begin with the minimum amount of statutory damages, $750 per infringement, and then treble that amount to note that the defendant committed a serious tort, I followed this practice.

However, in this case, because of Bryan White's having perjured himself at the Rule 104 hearing and having taken steps to destroy and conceal evidence, a further substantial award of damages was necessary.   In a criminal case, this conduct would be denominated as obstruction of justice.  Bryan White's wiping clean of his computer in attempting to cover up the fact that he had downloaded the BitTorrent software, as well as five of Malibu's movies, required a substantial penalty, and also to make a statement that would effectively deter others from acting as Bryan White had acted in this case.

I have previously noted the fact that the infringement cases brought by Malibu and other similarly situated companies have attracted a great deal of attention, not only of federal district judges but also of bloggers who assert that "copyright trolls" are using unscrupulous tactics and false accusations to collect millions of dollars from innocent and injured computer users.  I do not have any opinion as to the truth of the situation as regards to other plaintiffs in other courts. But here, Malibu has satisfied its burden of proof with substantial evidence and deserves a large award.  Bryan White, because of his conduct, deserves a heavy dose of damages which should also act as a deterrent to others.

I also find attorneys' fees and costs must be awarded in favor of Malibu and against Bryan White, in the stipulated amount of $128,350.50.

A Final Judgment will be entered.